```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF NEBRASKA
 3
 4   _____
 5   UNITED STATES OF AMERICA,         )
 6                                     )     4:13CR3121
 7                 Plaintiff,          )     September 7, 2016
 8                                     )     12:05 p.m.
 9   vs.                               )     Lincoln, Nebraska
10                                     )
11   JOSEPH J. BENZ,                   )
12                                     )
13                 Defendant.          )
14   _____  )
15
16                         VOLUME I of I
17            TRANSCRIPT OF SENTENCING PROCEEDINGS
18            BEFORE THE HONORABLE RICHARD G. KOPF
19         UNITED STATES DISTRICT COURT SENIOR JUDGE
20
21                    A-P-P-E-A-R-A-N-C-E-S:
22
23   FOR THE PLAINTIFF:        MR. STEVEN A. RUSSELL
24                             Assistant U.S. Attorney
25                             100 Centennial Mall North
26                             Suite 487, Federal Building
27                             Lincoln, NE 68508
28
29   FOR THE DEFENDANT:        MR. ROBERT B. CREAGER
30                             Attorney at Law
31                             1630 K Street
32                             Lincoln, NE 68508
33
34   DIGITAL OPERATOR:         CONNIE SCHULTZ
35
36   TRANSCRIBER:              LORI J. SEHNERT
37                             General Reporting Service
38                             610 J Street, Suite 20
39                             Lincoln, NE  68508
40
41                             - - -
42
43
44   Proceedings recorded by digital sound recording, transcript produced
45   by transcription service.
46
47
48
49
50
51
```

1          (Wednesday, September 7, 2016, at 12:05 p.m.)

2                    THE COURT:  Good afternoon.  We're on the record now in

3     United States versus Joseph Benz.  The case number is 4:13CR3121.

4     The matter comes on for sentencing.

5           Counsel, please remain seated, but now enter your

6     appearance.

7                    MR. RUSSELL:  Your Honor, please enter the appearance

8     of Steven Russell on behalf of the United States.

9                    MR. CREAGER:  Judge, Bob Creager, 1630 K Street,

10    Lincoln, for Mr. Benz.

11                   THE COURT:  And, Mr. Creager, could I ask you to pull

12    that mic closer to you?

13                   MR. CREAGER:  Is that better, Judge?

14                   THE COURT:  It is.  May I confirm with you, Mr.

15    Creager, that you have discussed the presentence report -- and

16    I'm talking now about the revised presentence report -- and any

17    addendum with your client and have shown him a copy?

18                   MR. CREAGER:  Yes, Your Honor.

19                   THE COURT:  That, then, takes me to the presentence

20    report itself.  My understanding is that there are no objections

21    to the presentence report, but Mr. Creager has filed a motion for

22    a variance.  Is that -- do I have the status of this matter

23    correctly?

24                   MR. RUSSELL:  Yes, Your Honor.  The Government has no

25    objection to the presentence report.

1          THE COURT:  You did object to my tentative findings.

2          MR. RUSSELL:  Yes.  And, quite honestly, Judge, I'm not

3    sure at what point in the proceedings I need to formally object

4    on the record to the vacating of the receipt charge.  So --

5          THE COURT:  So you herewith object?

6          MR. RUSSELL:  I do.

7          THE COURT:  And I herewith deny.

8          MR. RUSSELL:  And I would also object that there was

9    not -- to the Court's earlier finding that there was not enough

10   evidence of distribution, and I'd just simply do that for the

11   record as well.

12         THE COURT:  Thank you.  That objection is overruled.

13      Then, back to my original question.  There are no

14   objections -- assuming my earlier rulings are what they are, my

15   understanding is no one objects to the presentence report?

16         MR. RUSSELL:  That's correct, Your Honor.

17         MR. CREAGER:  We filed no substantive objections to the

18   report itself, Your Honor.

19         THE COURT:  And like you -- or like the Government's

20   lawyer, you think I heard, when I prohibited you from presenting

21   psychological testimony regarding the knowledge component of the

22   crimes --

23         MR. CREAGER:  Correct.

24         THE COURT:  -- you thought that you did not have to

25   present an insanity defense in order to present that testimony

4

1    and I disagree with you, and I presume you renew your objection

2    at this time?

3        MR. CREAGER:  Yes.  At some point, we'll just have the

4    historical discussion of how we got here in this unusual

5    circumstance, but that's -- yeah, that's part of it.  We

6    proceeded on that basis that we had to proceed with the insanity

7    defense.

8        THE COURT:  Right.  Well, let's do that, then, just a

9    brief summary, and you tell me whether you think I'm wrong.  Mr.

10   Benz was charged in a two-count indictment.  One count alleged

11   possession of child pornography and the other count alleged

12   receipt and distribution of child pornography.  There was a

13   non-jury trial -- well, during the course of the proceedings,

14   prior to the non-jury trial, Mr. Creager asserted that he should

15   be allowed to present psychological testimony -- well, with

16   respect to the question in the statute about knowledge, and I

17   denied that for the reasons that are articulated in the file.  I

18   found that the statute -- both statutes did not require that the

19   defendant know that what he was doing was unlawful.  In other

20   words, I found there was no specific intent requirement in the

21   relevant statutes.

22       Are you both in agreement with me up to this point?

23       MR. RUSSELL:  Yes, Your Honor.

24       MR. CREAGER:  Yes.  And I think procedurally what

25   happened was, I first gave notice of my intent to offer

1    psychiatric testimony on the question of his knowledge and/or

2    capacity diminished by the effects of the Pramipexole.  And we

3    went through a series of motions, and the reports were submitted,

4    and the Court then ruled in -- on the record that the offense was

5    a general-intent crime, not a specific-intent crime, and under

6    Eighth Circuit authority, diminished capacity type evidence,

7    psychiatric testimony on the defendant's intent or state of mind

8    is not relevant or admissible on general-intent crimes.  Then we

9    later, in light of Dr. Newring's subsequent analysis, gave notice

10    of the insanity defense.

11        And then, once we did that, we crafted this procedure

12    whereby, to preserve the diminished capacity defense, we would

13    have a bench trial and get at least the evidence on the record of

14    what this drug did or didn't do to Mr. Benz.  And so --

15        THE COURT:  And, in the interim, Dr. Benz was evaluated

16    at a federal medical center and so we then had a non-jury trial

17    in which we had two extraordinarily good psychologists testify,

18    and I found that Dr. Benz had met one prong of the insanity

19    defense, but not the second prong, which meant that he was guilty

20    of both offenses, and I so found and I articulated in a

21    memorandum and order.

22        After I made that finding, Mr. Creager alerted me to the

23    fact that, because I had also found that the evidence was

24    insufficient on distribution, my recollection is that the program

25    that the Government found operating did not have an on and off

6

1         switch, unlike LimeWire.

2              Are you with me to this point?

3                   MR. CREAGER:  Yes, Your Honor.

4                   MR. RUSSELL:  Yes, Your Honor.

5                   THE COURT:  Okay.  So Mr. Creager suggested that I had

6         the power and the obligation to vacate one of the crimes, because

7         the Eighth Circuit had held that if you have a possession crime

8         and a receipt crime, they are essentially the same, and you can't

9         punish somebody twice for the same conduct.

10             Then the question became which finding of guilty should be

11        vacated?  If I vacated the possession crime, that left the

12        receipt crime in place, which, in turn, triggered the statutory

13        minimum sentence of 60 months.  I looked very hard at the law and

14        concluded that I have the discretion to vacate the greater or the

15        lesser in terms of penalty.  For reasons which I've articulated

16        earlier, I vacated the greater, which means that Mr. Benz would

17        be found guilty of one crime and that will be the --

18             Is that Count 1, Mr. Russell?

19                  MR. RUSSELL:  It's Count 2, Your Honor.

20                  THE COURT:  -- Count 2 of the Indictment, and not Count

21        1, because they're the same crimes.

22             After that, I ordered a presentence report.  It was

23        conducted and submitted.  Mr. Creager filed his variance motion.

24        I issued tentative findings in which I gave the parties notice

25        that I independently was contemplating a variance to probation.

7

1    The Government, in turn, objected to my tentative findings in a

2    timely fashion, and that, then, I think, is a fair summary of

3    where we stand today.

4         Do you all agree?

5              MR. RUSSELL:  Yes, Your Honor.

6              MR. CREAGER:  Yes, Judge.

7              THE COURT:  Okay.  So, Mr. Creager, can we take up your

8    variance motion at the time of allocution?

9              MR. CREAGER:  Yes, Judge, that would be the best way to

10   handle it.

11             THE COURT:  In order to do that, what I must first do

12   is calculate the advisory guidelines.  We have a total offense

13   level of 27 and a criminal history category of one.  The

14   guideline range is 70 to 87 months in prison.  The supervised

15   release range is five years to life.  The defendant is ineligible

16   for probation under the guidelines, but is eligible for probation

17   under the statute.  Probation range is one to five years under

18   the statute.  The fine range in this case is $12,500 to $125,000.

19   There are three restitution claims here totaling $77,500, and a

20   special assessment of $100 is required.

21        Counsel, have I accurately stated the advisory guideline

22   ranges -- well, let me back up.  There's also a forfeiture in

23   this case that must be imposed and that's one Apple MacBook

24   laptop; a Sabrent external hard drive, 250GB; a 500GB external

25   Sabrent hard drive; and one Black Cruzer 4GB flashdrive.  Now,

1    have I accurately stated the correct advisory guideline

2    calculations and related information?

3         MR. RUSSELL:  Yes, Your Honor, with one exception.

4    Yesterday, I received a fourth victim restitution request that I

5    sent to the Court by email, along with Mr. Creager and Mr.

6    Holder.  I have a copy of it if the Court wishes to look at it.

7         THE COURT:  Well, isn't it too late?

8         MR. RUSSELL:  Well, I just want to make sure, if I

9    received it, I sent it to you as soon as I received it, and I did

10   that.

11        THE COURT:  When did you send it?

12        MR. RUSSELL:  I sent it yesterday to Kopf@ned.courts.

13   I'm not sure if that's the right --

14        THE COURT:  That's not my direct email.  That's -- I'm

15   not being critical of you.

16        MR. RUSSELL:  Yeah.

17        THE COURT:  You may or may not know.  I have a personal

18   email and I have a Kopf email, where everything in the world

19   dumps into it; proposed orders.  I've not seen it, I don't

20   think --

21        MR. RUSSELL:  I have a copy.

22        THE COURT:  -- so, let me take a recess.  We'll go pull

23   up that email.

24        MR. RUSSELL:  I also have a copy of it here in court,

25   if the Court wishes --

1            THE COURT:  Oh, do you?  If you want to, give it to me.

2            MR. RUSSELL:  May I approach, Your Honor?

3            THE COURT:  Sure.  This guy complains about the short

4    notice.  When does the restitution notices go out?

5            MR. RUSSELL:  I don't know exactly when they went out,

6    Your Honor.  I know that as soon as there was a finding of guilt,

7    we had the other three restitution claims --

8            THE COURT:  Yeah.

9            MR. RUSSELL:  -- and it's from the same law firm.

10           MR. HOLDER:  Your Honor, it's my understanding, in

11   speaking with Kim Roewert, that attorneys are registered with the

12   FBI.  The FBI is the agency responsible for obtaining these

13   victim statements.

14           THE COURT:  Yeah.

15           MR. HOLDER:  So, as soon as there's a case where a

16   victim has been identified, these attorneys are notified.  So

17   they're -- it's my understanding that they're notified as soon as

18   their victim -- their client has been identified as a victim in a

19   case.

20           THE COURT:  Well, that would've happened long ago.

21           MR. HOLDER:  That's my understanding of the procedure,

22   Your Honor.

23           THE COURT:  Well, I'm inclined to say it comes too

24   late.  I mean, we're in the middle of sentencing.  And I'm not

25   being critical of you.  I'll leave the bench here in a minute

1          and -- you say it came to Kopf -- the Kopf email?

2                  MR. RUSSELL:  Yeah.  I sent a copy to Mr. Creager.  He

3          has his copy.  And I bet it happened yesterday between 1:00 and

4          two o'clock in the afternoon.

5                  THE COURT:  We were somewhat busy yesterday dealing

6          with the Beatrice 6 case, so it's possible that -- I don't see

7          it.  Would've been in the afternoon, you say?

8                  MR. RUSSELL:  I believe so.  I sent the same email to

9          Mr. Creager and to Mr. Holder.

10                  MR. HOLDER:  My email was time stamped at 2:21, Your

11          Honor.

12                  THE COURT:  Thank you, J.R.

13          Nope, I didn't get it in my personal email.  If you don't

14          mind, I'll take a break and we'll call up the other one and find

15          out, so I can confirm on the record that I rec- -- that one of my

16          email accounts received it.  But I'm inclined to deny this.  I

17          mean, Mr. Holder, our probation officer, tells me that the claim

18          that -- given the short time between the notice of the

19          defendant's sentencing -- I mean, if these people are notified

20          even before sentencing by the FBI -- and this is Jessica --

21          Do you know anything about Jessica?

22                  MR. RUSSELL:  I mean, I -- just so the Court's clear, I

23          know the Jessica series is a well-known series.  I know that it

24          is on file with the Department, that information.  That

25          information is in -- as soon as there is a conviction -- I know,

1        at least as soon as there is a conviction, victims who have been

2        identified are notified and that comes through our victim witness

3        coordinator.  So, the other three victims submitted material --

4                    THE COURT:  Long ago.

5                    MR. RUSSELL:  Yes.  And, like I say, I got this

6        yesterday and immediately forwarded it on, I thought, to you and

7        to the attorneys.

8                    THE COURT:  Well, if I deny this, then I've got to make

9        a report to Congress, literally, but I'm -- which I don't care.

10       Let me go check.  I'll check to see if we got it.

11                   MR. RUSSELL:  If you don't mind, Judge, I'll go down to

12       my office and get the sent email so that you know exactly when I

13       sent it.

14                   THE COURT:  Well, then you can make a record -- you can

15       tell the Marsh Law Firm that I just said it came too late

16       and -- but you made a record for them.  And I suppose they

17       can -- there's a question about jurisdictionally what they can

18       do, but that's their problem.  But I don't want the record to be

19       unclear, so why don't you do that and I'll go do it.  We stand in

20       recess.

21                   (Off the record.)

22                   THE COURT:  Please be seated.  We're back on the

23       record.

24               Counsel, at 2:21 p.m., my email -- there's no secret about

25       this, it's in the local rules or available on the net,

1      Kopf@ned.uscourts.gov, received a forwarded email -- well,

2      received an email addressed to Judge, Bob, and J.R.  It says, "I

3      just received the restitution request on the Jessica Series.

4      Please let me know if you have any questions.  Thanks, Steve."

5      And he attaches "Mr. Russell from" some lawyer in New York, and

6      then the letter.  So, I didn't see it yesterday.  First time I

7      saw it is when I came to court just now.  I'll mark this as

8      Court's Exhibit No. 1 and receive it into evidence unless there's

9      an objection.

10              MR. RUSSELL:  No objection, Your Honor.  The only thing

11     I'm concerned about, when I sent that to you, I had not checked

12     to see whether it should've been redacted.  So, I would ask that,

13     for the purpose of this hearing, it be --

14              THE COURT:  Sealed?

15              MR. RUSSELL:  -- marked as a restricted document, yeah.

16              THE COURT:  You want it sealed or restricted?

17              MR. RUSSELL:  Restricted, I think, would be fine.

18              THE COURT:  Okay.  It'll be -- the exhibit is

19     restricted.  Did you clarify the procedure when you were down

20     there, when you went back to your office?

21              MR. RUSSELL:  I did not, Your Honor.  I was checking to

22     make sure about the timeline with respect to the email, but I do

23     know what the procedure is and --

24              THE COURT:  Can you think of anything why these folks

25     couldn't have responded earlier?

1          MR. RUSSELL:  Not when the other three did.  I mean,

2     that's the concern I have, is, I don't know why -- because

3     everyone who is listed on that report -- on the NCMEC -- the

4     National Center for Missing and Exploited Children prepares a

5     report.  When we get that, we -- I don't know what the right term

6     is -- cross-match it with victims who are in a database of the

7     Department of Justice.  They are sent notices.  My guess -- and

8     we see this in a couple of cases.  It's not like this is unusual

9     that we may have -- we'll have two different cases that both have

10    the Vicky Series.  One case there'll be a request for restitution

11    and one case there will not.  And a lot of that is the internal

12    procedures within their own law offices, where some will hit and

13    some will not.  I can't tell you why this one was sent to me the

14    day before the sentencing.  I just know that as soon as it was, I

15    sent it up to you just to be on the safe side because I think I

16    have the obligation to do that.  So, that's -- I mean, I don't

17    mean that in a --

18          THE COURT:  No.

19          MR. RUSSELL:  -- I just mean I wanted to make sure that

20    you had the request as soon as I received it.

21          THE COURT:  No.  You did -- the only thing you

22    have -- and I don't mean this in any way as a criticism, but you

23    have access to my -- what I'll call my real email, my day-to-day

24    email, and on something like this --

25          MR. RUSSELL:  Quite honestly, Judge, I should've

1    checked that.  I just clicked "Kopf" and I thought I hit every

2    email that I -- in my system.

3         THE COURT:  I'm not being critical.  I understand why

4    you did it and you notified me.  I mean, I -- it just matters how

5    fast I can react.

6         Okay.  I'm going to deny the Jessica request from the Marsh

7    Law Firm for two reasons.  Number one, it comes far too late.

8    And, number two, it's insufficient.  It makes a bunch of

9    statements -- it's a well-written memorandum, but it hasn't got

10   any supporting data that -- there's a letter from the mother.  It

11   doesn't have anything about -- no detail about money, about how

12   the child is getting along.  Apparently, she's now 17.  The law

13   firm says, "We have not yet had the opportunity to retain experts

14   and prepare formal forensic or damage reports."  Well, that's not

15   my problem.  They want a 60-day continuance.  Apparently, they

16   are asking for it one day prior to the sentencing hearing, and I

17   don't think that's fair to Dr. Benz to delay sentencing anymore.

18   So, I'm denying it for two reasons: one, it came too late; two,

19   it's insufficient; and I therefore reject it.

20        Do you want any further ruling, Counsel?

21        MR. RUSSELL:  No, Your Honor.

22        THE COURT:  Okay, thanks.

23        So, let's go back so the record is clear.  We have a 27-1.

24   Custody range is 70 to 87 months.  Five years to life, supervised

25   release.  The defendant is ineligible for probation under the

1          guidelines, but not the statute.  Fine range is $12,500 to

2          $125,000.  There's a total amount of restitution requested in the

3          sum of $77,500, and I'll get to the specific -- well, just for

4          the record, those victims are the Vicky Series, the Sarah Series,

5          and the Casseaopeia Series.  And the special assessment is $100.

6          There's a forfeiture required, as I've indicated earlier.

7               Now, have I stated the correct advisory guideline

8          calculations and related information given my ruling?

9                    MR. RUSSELL:  Yes, Your Honor.

10                   MR. CREAGER:  Yes, Judge.

11                   THE COURT:  I have prepared a sentencing summary that

12         I'll have counsel -- pardon me, I'll have the CRD hand out

13         to -- one to Mr. Russell, two to Mr. Creager, one to the

14         probation officer, and then I'll hear the parties on allocution.

15         I'll give you an opportunity to read it and then you can address

16         it during your allocution.

17              Are you ready, Counsel?

18                   MR. RUSSELL:  Yes, Your Honor.

19                   THE COURT:  Let me hear from the Government.

20                   MR. RUSSELL:  Well, obviously, Your Honor, we object to

21         the imposition of a term of probation rather than a term of

22         imprisonment.  We believe that a term of probation in this case

23         does violate the tenants of 3553 --

24                   THE COURT:  Which one?

25                   MR. RUSSELL:  -- in that there is no pers- --

1               THE COURT:  Which one?

2               MR. RUSSELL:  -- there is no grounds for a variance.

3      Specifically, Your Honor, with respect to the physical condition

4      of the defendant, I do understand that the defendant suffers from

5      a number of medical conditions.  However, that's not a

6      determining factor in varying downward from the sentencing

7      guidelines.

8               THE COURT:  But that --

9               MR. RUSSELL:  This is a unique -- I'm sorry, Your

10     Honor.

11              THE COURT:  But that's not the only reason for the

12     variance.

13              MR. RUSSELL:  Well, I think I should -- for the record,

14     I should separate them out and then we can talk about them

15     together.

16              THE COURT:  Okay.

17              MR. RUSSELL:  But, with respect to the physical

18     condition, the reason why I don't believe that it is a proper

19     grounds for variance of any magnitude in this case is because

20     this is a case where the defendant has spent time in a Bureau of

21     Prison setting.  He did not have a problem with being in --

22              THE COURT:  Oh, he fell.

23              MR. RUSSELL:  But, Your Honor, I understand he fell,

24     but I think that the determination of the Bureau of Prisons was

25     that they could --

1            THE COURT:  He lacerated his head, didn't he?

2            MR. RUSSELL:  -- they could accommodate his -- yeah.

3    Well, I mean, it's not -- he's not going to be the first or the

4    last prisoner who has a problem at a medical center with either

5    falling or having a concern.  What I'm saying is, I think that

6    the Bureau of Prisons was able to adequately deal with that.

7    There is no -- there was no determination that there was a

8    problem with his physical condition as it currently exists that

9    they can't take care of it.  I'm not saying that things will

10   never happen, but I'm saying that for purposes of a downward

11   departure, that is not an appropriate grounds solely for a

12   downward departure or, quite honestly, Your Honor, even in

13   combination with other factors.

14       The second ground that the Court has is that the defendant

15   would not have committed this crime but for taking this drug.  I

16   don't agree with that.  I don't think that's what the evidence

17   shows.  And, quite honestly, I don't think that's even what the

18   Court's determination was when the Court found the defendant

19   guilty of receipt that the Court's now vacating.  Because you

20   can't look at this crime at the time -- in a context anything

21   other than a continuum.  Whether you say he wouldn't have started

22   downloading child pornography, the 21,000 images of child

23   pornography that we have, whether you say he wouldn't have

24   started that at some point -- you even indicate he understands

25   the wrongfulness of his actions.  He knows what he is doing is

 1    wrong and he continues to do what you say he knew was wrong.  So,

 2    you can't, in isolation, say, "Well, he wouldn't have done this

 3    crime but for the Mirapex," but on the other hand, he would've

 4    continued the crime because that's exactly what happened here.

 5    Whether we want to get to the sentence of probation, the facts

 6    show that he knew what he was doing was wrong.  He never, ever

 7    told the doctor about what he was doing.  He knew it was wrong

 8    and he continued to do it.  And so when the Court says you want

 9    to vary because he would not have done this, you're negating all

10    of the factors that indicate that he knew it was wrong and he

11    continued to do it.

12              THE COURT:  No.  I can -- I said that he was acting

13    like a vigilante, that he knew that he was seeing child

14    pornography, and there was a reason for him acting as a

15    vigilante, and I can go into that in detail if you care to.  But

16    it's -- the drug manufacturer warns people that if you take this

17    stuff, you will engage in compulsive behaviors, including online

18    gambling, which occurred in this case, crazy spending, which

19    occurred in this case, and hypersexuality, which occurred in this

20    case.  Now, there is no evidence that Benz was doing anything

21    illegal prior to his ingestion of Mirapex.  Isn't that right?

22              MR. RUSSELL:  That's right, Your Honor.  He was not

23    uncovered -- he was not discovered by law enforcement until --

24              THE COURT:  Until after --

25              MR. RUSSELL:  -- yeah, until after 2007.

1             THE COURT:  Until after he was on Mirapex.

2             MR. RUSSELL:  Yes.

3             THE COURT:  Yeah.  So, I've concluded that, but for the

4       ingestion of Mirapex, he wouldn't have done this.

5             MR. RUSSELL:  But my point, Your Honor, is that you're

6       saying he would not have started.  I understand that's the point.

7       What I'm saying is that when you say that the drug manufacturer

8       says these are side effects, the next thing the drug manufacturer

9       says is, "If you have these side effects, notify a doctor."

10            THE COURT:  Right.

11            MR. RUSSELL:  He didn't do it.  He continued to --

12            THE COURT:  Well, that's hardly surprising given the

13      nature of the drug.

14            MR. RUSSELL:  No, no.  Judge --

15            THE COURT:  The reason they have the warning for the

16      doctors is because people on this drug -- as a matter of fact, if

17      you look further at the literature, doctors are told that they

18      will not -- many of them will not recognize their symptomology.

19            MR. RUSSELL:  Because, Your Honor -- that's my point.

20      Because, if I like to gamble and I got on Mirapex, I may gamble

21      more.  I understand that.  If I have -- if I spend, if I shop,

22      and I'm on Mirapex and I shop more than I have before, doctors

23      are made aware of that.  What I'm saying here, in this case, is,

24      what Dr. Benz did was, he did something that you just now said,

25      "The Government couldn't prove he did it before this."  Well, so

1    this is totally out of the nature of anything that ever happened

2    to him.

3         THE COURT:  Right.

4         MR. RUSSELL:  And now, all of a sudden, he

5    continues -- he doesn't notify a doctor and he continues this

6    activity.  I think that puts him more in the context of somebody

7    who knows what he's doing is wrong and continues to do it.  And,

8    in 3553, what the Court is asked to consider is how the nature of

9    this -- character of this offense occurred.  And here what you

10   have is a person who not only -- I mean, Judge, it's

11   just -- there's so many inconsistencies here.  You're

12   saying -- not you, but I mean the evidence in this case is that

13   Dr. Benz not only just downloaded stuff to -- as a vigilante, he

14   also moved the stuff to other hard drives.

15        THE COURT:  Sure.

16        MR. RUSSELL:  You can't say that, Judge.  You can't say

17   that he moved it to other hard drives because he wanted to

18   continue vigilante work.  He moved it to a thumb drive that we

19   found at the University of Nebraska at Kearney.  That is not

20   consistent with a person who is merely trying to look for and do

21   vigilante work.  That's -- I'm sorry, that's totally

22   inconsistent.  And what I'm saying is, when you look at varying

23   from a 70-month sentence that Congress believes, even under 3553,

24   the Court has to consider significantly different.  I just don't

25   believe the continuum of this offense is significantly different

1     that warrants a probationary sentence.  I understand the Court

2     saying, "You should vary" -- I mean, look, I have to acknowledge

3     the guidelines are here.  I have to acknowledge that I think the

4     guideline sentence is appropriate.  But I will indicate to the

5     Court, I understand the Court varying, because even Dr. Boutwell

6     says that there is some inhibition of self-control.  I mean,

7     there is a lessening of the -- there is a lessening of

8     self-control, but that does not warrant a sentence of no term of

9     imprisonment.  You should sentence Dr. Benz to a term of

10    imprisonment, whether it be the 32 months that Probation

11    recognizes or a higher sentence, which is what the Government

12    would recommend.  To not impose a term of imprisonment, I

13    believe, is wrong.  I believe that is contrary to what the

14    prescripts of 3553 talk about, both in nature of the offense, the

15    recommendation for deterrence.  I think all of those things are

16    taken into account and I will simply leave it at that.

17         THE COURT:  With respect -- I'll take your two last

18    points in reverse order.  With respect to deterrence, I do not

19    need to be overly concerned with the general deterrence here

20    because this case and the utilization of Mirapex for a person

21    with MS and RLS is unique, and the number of other people who

22    would be generally deterred is vanishingly small.

23         Secondly, with regard to specific deterrence, there is

24    absolutely no reason to believe that once the doctor got off

25    Mirapex, he is likely to re-offend.  With respect to the nature

1    and circumstances of the offense, there is no doubt that the

2    defendant was hoarding child pornography.  The compulsion, the

3    hypersexuality, however you want to describe it, is a product of

4    the drug.  And your argument that he should've recognized that,

5    "My inhibitions are substantially diminished" flies in the face

6    of the medical science.  People on this drug frequently do not

7    know that their inhibitions are substantially lowered.  And I'm

8    persuaded that had he not taken Mirapex, and had he not had MS

9    and RLS, that this crime wouldn't have been committed.  That,

10   coupled with the fact that there's no question that he's

11   substantially physically impaired, suggests to me that a variance

12   to probation is entirely justified.

13       Do you have anything you'd like to add?

14       MR. RUSSELL:  There is no study that Dr. Newring

15   provided that says that a person of -- when we talk about

16   hypersexuality, most of the cases that Dr. Newring talked about

17   were cases where a person has sexual -- I mean, people like sex,

18   and people would do something in addition to the sex.  There is

19   no study that says that people on Mirapex start looking at child

20   pornography, that -- matter of fact, there was no study that even

21   said that.  So, the idea that the Government is doing something

22   totally outside the science, there was no science about it,

23   Judge.  There's no science that says, "You're going to start

24   taking -- you're going to start looking at child pornography."

25   And my point is, when you're talking about hypersexuality, I

1       understand hypersexuality.  This is something so totally

2       inconsistent that when doctors ask you, "Are you having any

3       problems?" and you say, "No," knowing that you're doing something

4       that you believe is so totally inconsistent, that, in and of

5       itself, is a red flag to me.  And when you continue to do it -- I

6       mean, you're saying he was hoarding it.  Dr. Newring says he

7       wasn't trying to possess it.  Dr. Newring says all he wanted to

8       do was receive it so he could discard it as he wanted.  But, yet,

9       his actions aren't -- they belie that action.  They belie that

10      idea.  The idea is that he was trying to keep this stuff.  That's

11      the whole point.  And so, when you put it on a thumb drive, when

12      you take it with you places, when you put it on hard drives, you

13      are doing things that are not just compulsive in terms of a drug.

14      You are doing things that are compulsive in terms of what you

15      want.  You are doing exactly like compulsive gambling.

16                  THE COURT:  If that were the case, the Government would

17      have evidence that this man downloaded child pornography before

18      he began taking Mirapex.

19                  MR. RUSSELL:  Well, how do you know that?  We -- how

20      would you know if he changed his computer?  How would we know if

21      he --

22                  THE COURT:  What we do know, from everything, is this

23      man's personality completely changed.  His president of the

24      faculty said he was a tenured professor.  He took his autistic

25      child, who became an eagle scout -- there wasn't anything prior

1     to the taking of Mirapex that would indicate that this man was

2     inclined to do what you say.  So, to suggest that the Mirapex

3     wasn't the causative factor -- it may not have been the only

4     causative factor, that gets into all sorts of extraordinarily

5     difficult questions, it seems to me, about what his psychological

6     state was at the time he took the drug.  But to suggest that the

7     Mirapex didn't cause this crime is just wrong.

8             MR. RUSSELL:  Judge, no.  I'm not suggesting that the

9     use of the Mirapex had no effect.  I think even Dr. Boutwell will

10    indicate that it had some effect.  What I am saying is, when you

11    say that, "For that 2007 to 2009 time frame, this would not have

12    occurred except for the fact he was taking Mirapex," we don't

13    know that.  What we know is, is that he was taking affirmative

14    steps between 2007 and 2013 or '14, whenever we did the search

15    warrant, to not only maintain child pornography, to find it, to

16    use different types of file sharing programs that would hasten

17    his ability to get child pornography, and that then he was

18    keeping it.  That's what the evidence shows.  Now, I agree with

19    you.  You may say what point in time that occurs.  I'm just

20    telling you that at the point in time between 2007 and 2014, you

21    even indicate that he knows what he's doing during that period of

22    time is wrong.  And if that's true, that he knew what he was

23    doing was wrong, then there had to be some type of other event

24    that occurs.  I mean, he has -- I mean, why wouldn't you

25    tell -- my point of view is, why wouldn't you tell the doctors?

1    Why wouldn't -- when the doctor's asking you whatever's

2    happening, you would say it.  Now, you may disagree with that.  I

3    understand that.  I'm just saying that that is my contention.

4            THE COURT:  Sure.

5            MR. RUSSELL:  For purposes of a variance, you not only

6    have to look at what occurred at the start, but what occurred

7    during that period of time.

8            THE COURT:  And I --

9            MR. RUSSELL:  And the idea that you're saying, "Well,

10   he showed no evidence before this."  Judge, we have had so many

11   cases in this district of child pornographers that we don't have

12   any clue about anything they do until the time that we actually

13   catch them.

14           THE COURT:  Yeah, but we have 50 years of his life in

15   front of us that is entirely exemplary.  If you want to talk

16   about other cases, let's do that.  You tell me anybody we've had

17   in here who's had life experiences similar to Dr. Benz, who's

18   lived a life as exemplary as he has.  Nobody.

19           MR. RUSSELL:  James Haugh.

20           THE COURT:  Who?

21           MR. RUSSELL:  James Haugh.

22           THE COURT:  Who's James Haugh?

23           MR. RUSSELL:  That was a Judge Gerrard case.  James

24   Haugh was a lifetime life insurance salesman, had a great job in

25   Grand Island --

1        THE COURT:  He didn't take Mirapex.

2        MR. RUSSELL:  He didn't take Mirapex, I grant you that,

3   but he had an exemplary life, no problems.  We find him with

4   child pornography.

5        THE COURT:  No, that's my point.  With the Mirapex, if

6   you've got 50 years of behavior that is entirely legal, and then

7   the guy starts taking this drug that the FDA requires them to

8   warn about its potential, it's really hard for me to think that

9   the fact that he continues to -- the fact that his inhibitions

10  continue to be reduced does not suggest -- I guess the simplest

11  way to say it, I think this case is so unique, I've not had

12  anything closely resembling it.

13       MR. RUSSELL:  I don't disagree with that, Your Honor.

14  I really don't.  I'm not -- that's not my point.  My point is, is

15  that when the Court looks at a variance to this degree, I don't

16  believe that a variance to this degree is warranted.

17       THE COURT:  Sure.

18       MR. RUSSELL:  And I would -- it is not my intention

19  here -- I am trying to show deference to the Court.  I'm trying

20  to be as respectful as I can --

21       THE COURT:  You are.

22       MR. RUSSELL:  -- and I'm not trying to argue with you.

23  I'm just trying to indicate what the Government's position is

24  with respect to why we believe that a variance --

25       THE COURT:  Sure.

1          MR. RUSSELL:  -- is not -- either not warranted in this

2     case or certainly not to the degree that the Court is indicating,

3     and I'll leave it at that.

4          THE COURT:  Are there any -- I don't mean this to wave

5     a red flag in front of a bull, but are there any other 3553(a)

6     things you want me to especially consider?

7          MR. RUSSELL:  Well, I think the Court is -- I also

8     don't want to raise the red flag either, Your Honor.  I think the

9     Court is incorrect in the adequate deterrence.  I believe that we

10    really don't know about specific deterrence here, because Mr.

11    Benz was found and arrested at a time when he was taking Mirapex.

12    So, we don't know what his future conduct is going to be.  I do

13    believe that specific deterrence is important in this case, but I

14    also believe that general deterrence is important, that

15    you -- that if, when you come into a court, when you want to

16    argue things like this and you want to take this to a trial on

17    both a receipt and a possession charge, I believe you should be

18    found -- you should be sentenced on the receipt.  And, because of

19    that, I believe that a five-year sentence is warranted at a

20    minimum.  I believe that for general deterrence as well.  I grant

21    you this is a unique case, Your Honor.  I understand all the

22    arguments that you've already made about that.  I simply do not

23    believe that general deterrence is being served with a

24    probationary sentence.

25          With respect to the -- providing any medical care, I think

1    that medical care can be provided by the Department -- the Bureau

2    of Prisons.  I don't -- I mean, with respect to future crimes,

3    again, that's already been addressed.  I don't really need to do

4    that.  So, with those statements, I think I'm done.  So, thank

5    you.

6         THE COURT:  Thank you.  Mr. Russell, we've known each

7    other long enough to know that there's virtually nothing you

8    could do to offend me.  You're always respectful, and you're

9    passionate, and you're zealous, and that is as it should be.

10        Mr. Creager?

11        MR. CREAGER:  I hardly to know where to start and maybe

12   that's an indication that I shouldn't start at all.  But when you

13   tell the story of Mr. Benz from where he was to where he is,

14   sitting next to me as a convicted sex offender in possession of

15   child pornography, lost his job, his tenured position over this,

16   to be arguing these fairly intricate arguments about what Mirapex

17   did or didn't do just is strange.  Because I agree, everybody,

18   perhaps except Mr. Russell, agrees that the drug caused us to be

19   here.  And I will tell you this.  I was skeptical at first.  "The

20   drugs made me do it."  Yeah, I've heard that.  "The alcohol made

21   me do it."  Yeah.  "My anger made me do it."  Everybody has sort

22   of an excuse that something else made me do it and we lawyers

23   say, "Yeah, we've heard everything at least once and sometimes

24   twice," and we know what works and doesn't work.  But then Dr.

25   Newring chimes in and he starts to say, "Hey, I'm skeptical,

1    too." But, as you look at the study, it took a while for the
2    pharmaceutical industry to figure out what they had created when
3    they created Mirapex. And there's other drugs like it. It's not
4    just Mirapex. And my recollection of the timeline was simply
5    that when they gave this drug to him, there were no warnings. He
6    was given no warnings. The doctors didn't have warnings. I
7    think the warnings came about much later, maybe -- I think your
8    Court's Exhibit whatever -- I forgot the number -- you look now
9    and the warnings are everywhere. But the carnage that preceded
10   the warnings was remarkable. And the studies that Dr. Newring
11   talked about became so overwhelming and they're general
12   acceptance in the pharmaceutical/psychological community that
13   finally Mirapex stopped defending its own drug and puts this
14   warning out that it causes normal people do to crazy things. I
15   think it's fair to Mr. Russell to say it causes crazy people to
16   do crazier things, but that doesn't mean it doesn't cause people
17   that really have no penchent -- and let's talk about that. When
18   I wake up every morning, the first thing I say to myself is, "You
19   know, I'm not going to kill anybody today, because I might go to
20   prison." There are people that probably get up in the morning
21   and say, "I'm not going to do something illegal, because I'm
22   going to go to prison." We naturally moderate our conduct, our
23   own psychological balancing. When I decide to speed on my way to
24   court because I'm late, I can decide to speed or not. "Well, I
25   won't speed, because I'll get" -- we do this all the time. And

1       some people have a better handle on making those judgments than

2       others.  Right down the line, others kind of veer off course from

3       time-to-time, basically -- but they're in the line and there's

4       just people way off in the weeds.  Dr. Benz didn't have any

5       trouble with the line.  Dr. Benz was a rock star professor.  He

6       was everything that I think, as a young child, if he'd grown up

7       to be the Dr. Benz that was there, he'd have been proud of

8       himself.  His family was proud of himself.  And then, boom, off

9       the cliff he goes.

10          I believe, honestly -- and we had this debate and I lost it

11      round one, I don't think it is irrelevant that what he was doing

12      was affected by a drug that made him do things that he wouldn't

13      otherwise have done.  I call that diminished capacity.  The Court

14      calls it, sort of, insanity.  But let me ask this question.  If

15      somebody held a gun to his head and said, "Download child

16      pornography or I'm going to shoot," is that a voluntary act?  I

17      know it's wrong, but what's making me do it is some outside

18      influence over which I have no control.  And, to me, Mirapex was

19      the metaphorical gun held to his head that was making him do

20      things, and the things that moderate conduct, "Should I do it?

21      Should I not do it?  Am I going to get in trouble?  Am I not

22      going to get in trouble?"  Those were gone.  The Mirapex

23      effectively tipped the balance in favor of, "Just do whatever

24      your brain is telling you to do."  There isn't that thing in

25      psychology, I guess, that -- that DNA in our brain that wants us

1        to comply with rules.  I wish I could've been successful on this

2        first phase of this case and gone to a jury and tell them his

3        story.  They might have said he's not guilty of anything.  But

4        we'll have that battle as to whether this is a specific-intent

5        crime, a general-intent crime, whether the evidence should've

6        been considered for that purpose or not.  That's baked into the

7        cake.  But even the State's -- the Government's expert really

8        didn't dispute Dr. Newring at the core.  There were little

9        changes around the wording, around the edges, but even the

10      Government's expert understood that Dr. Benz was acting in

11      response to whatever chemically induced behavioral changes

12      Mirapex caused, and that just seems so clear to me that I don't

13      even know why we're debating.

14           If you take that away, if you take --

15           THE COURT:  I think what Mr. Russell is -- and I don't

16      want to speak for him -- but I think he's saying, "Remember,

17      Kopf, you found that he" -- well, let's --

18           MR. CREAGER:  You found that I failed on insanity

19      because he did things that suggested he knew it was wrong and

20      the -- and isn't the -- I had to prove by clear and convincing

21      evidence that -- or we had to establish by clear and convincing

22      evidence that that component of the insanity defense had to exist

23      for him to be found not responsible by reason of insanity.

24           THE COURT:  Well, I found that there was a mental

25      defect.

1          MR. CREAGER:  Yes.  And --

2          THE COURT:  And then I found that there are -- as the

3     Seventh Circuit has articulated, there are three ways of knowing

4     something is wrong.  Subjectively, your client did not believe

5     what he was doing was wrong because he -- because, in his state

6     of mind, he was searching for someone who had harmed him and his

7     sister.  And he thought that his behavior was, therefore,

8     justified.

9          MR. CREAGER:  Justified, yes.

10         THE COURT:  That's the -- that's one way of looking at

11    the statute.  Virtually, no court has said that that's insanity.

12    You either -- well, there are two other tests and it doesn't

13    matter which one we apply here.  He met them because he

14    recognized, I found, that what he was doing, even though he

15    thought it was morally justified, he hid from others.  And that

16    suggested to me that you couldn't prove up - you failed to prove

17    up -- we're doing lawyer talk now, this is not a criticism -- on

18    the second element of the insanity defense.  Go ahead.

19         MR. CREAGER:  And so, in the end, I suppose a variance

20    off the guidelines are just that; guidelines.  There are

21    sentencing purposes in the statute, and there are typically the

22    hard-fact cases, where you really can't look and find anything

23    like it anywhere.  And I tried.  I think, even in the preliminary

24    days, I'm arguing with the Court about where this evidence fits

25    on the continuum from irrelevant, to diminished capacity, to

1    insanity.  I couldn't find anything where this convergence of

2    facts and circumstances, and drugs, and drugs at a time when it

3    was unknown that it caused these side effects, to compare it to.

4    But I think it's more appropriate to look at Dr. Benz as if he

5    was forced to do something against his will, rather than doing

6    something in furtherance of his will.  In other words --

7            THE COURT:  Well, that sort of used to be the law until

8    a crazy guy shot President Reagan and then the law was changed.

9            MR. CREAGER:  Yes.  And if there's anything in my

10   judgment that's not adequately factored into the guidelines or

11   into the vari- -- or the departure issues that normally accompany

12   the guidelines -- we just went right to variance.  We didn't go

13   through departure because I think it's all basically one and the

14   same at this point.  Dr. Benz, sitting here, didn't commit this

15   offense.  It's just that simple.  Something happened that the law

16   needs to deal with, and if the law can't excuse him, if the law

17   can't say that, "We understand that what you did was totally out

18   of character, and it wasn't even anything that you did because

19   you were mad, you were angry, you were pissed off, you were

20   depressed."  I mean, "We are -- you did something because

21   somebody gave you something that they didn't understand would

22   cause you to do things."  Where in the guidelines do we find

23   that?  We don't.  Where, in the case law, do we find discussions

24   about just how unusual that is?  I think probably it's a

25   once-in-a-lifetime case and this may be it.  Because, unless

1     there's somebody in the pipeline, I think the warnings are out

2     there.  I think those people will now understand more carefully

3     and look out for these changes in personality, go back to

4     doctors.  They will now recognize that, "Oh, my gosh" -- and Mr.

5     Russell is wrong about one thing.  Dr. Newring's opinion became

6     much more persuasive, at least to me and perhaps to the Court,

7     when he said we actually saw the change in the effect that Mr.

8     Russell says we didn't get to see.  He either ran out of it or

9     stopped taking it for a period of time and his wife testified

10    that there was -- in a short period of time, the old Joe was

11    coming back, but the desire to get him back on the medication to

12    treat the condition overcame whatever signals there were, and he

13    went back to being the troubled Joe.  So, my recollection is, Dr.

14    Newring says that is gold.  You actually have a period of time in

15    which we were able to evaluate Joe's character, personality

16    issues, when he was off the drug and the history was pretty clear

17    that those traits, the Joe that disappeared, came back.  So, he

18    was even more persuaded that Mirapex was at the core of the

19    conduct simply because he had an opportunity to see in real time

20    Mr. Russell's argument that, "Well, we don't know what would

21    happen after he came off the Mirapex, whether he would've still

22    been involved in child pornography."  It's an interesting

23    argument, but Dr. Newring basically, I think, closed that door

24    when he said, "Look.  I actually have evidence here that the old

25    Joe came back."

1        And then, of course, I think his testimony was also that

2    there was a time after that, before he was indicted or charged,

3    that when he went off the drug, he was better, and then, on

4    into -- maybe it was after the indictment.  But you heard the

5    testimony from the family member, the re-emergence of Joe Benz,

6    the rock star college professor, came back.  So, Mr. Russell

7    thinks putting him in prison for 32 months serves some deterrent.

8    I don't know who it's going to deter.  It's not -- Mr. Benz

9    couldn't have been deterred under those circumstances because he

10   wouldn't have been able to understand the deterrent value of it

11   because his whole psychological mental frame of mind was warped

12   by a drug.  I don't know that there's anybody else out there that

13   would -- that could be deterred, and what punishment does he

14   deserve at this point that he hasn't suffered from the collapse

15   of life as he knows it?

16       So, when you look at the purposes under 3553 of sentencing,

17   he suffered enough.  The law did not serve him well, generally

18   speaking.  We're trying to get to a just result.  I don't know

19   why the Government couldn't have taken some of this into

20   consideration.  We tried to resolve it.  I took a big gamble,

21   didn't I?  I took a huge gamble going to trial, not taking a

22   plea, all the stuff that comes along with it, because there are

23   significant legal questions here.  But where we are right now

24   today, based upon the evidence adduced at the trial, based upon

25   the Court's findings, your proposed variance, whether it was mine

1          or the one set forth in the presentence to Probation, makes

2          perfect sense, and it may be the only just sentence that could be

3          imposed in this case.  I think you're 100 percent right on;

4          that's what should happen.  Probation seems entirely appropriate

5          through variance, departure, or whatever mechanism that gets

6          there.  And he'll figure out how to live the rest of his life as

7          a felon and a registered sex offender.

8                    THE COURT:  Thank you.

9            Dr. Benz, you have the right to speak before I sentence you.

10        You're not obligated to speak, but you certainly may if you wish.

11        Would you like to say anything?

12                    THE DEFENDANT:  Your Honor, no, thank you.

13                    THE COURT:  Alright.  After considering all the

14        statutory goals of sentencing and the advisory sentencing

15        guidelines, I impose five years of probation and vary downward on

16        my own motion to probation.  I do so because of the defendant's

17        physical condition and due to the fact that I am persuaded that

18        the offense would not have occurred but for the prescription drug

19        Mirapex the defendant was taking as a result of his multiple

20        sclerosis and the associated symptoms of restless leg syndrome.

21        The defendant's affliction is an unpredictable and disabling

22        disease of the central nervous system that confines the defendant

23        to a wheelchair or requires the use of leg braces and other

24        assistive devices.

25                    In addition to the standard conditions of probation, the

37

1    following special conditions are imposed and they are set forth

2    in the sentencing summary that I will mark as Court's Exhibit 2,

3    and counsel have had an opportunity to review that, I believe.

4           MR. RUSSELL:  Yes, Your Honor.

5           MR. CREAGER:  Yes, Judge.

6           THE COURT:  Insofar as restitution is requested, and

7    following the case of U.S. against Fast, F-a-s-t, a case that I

8    decided, I award Vicky restitution in the sum of $3,333; Sarah,

9    $3,333; and Casseaopeia, $3,333.  The total, then, is $9,999 to

10   be paid during the term of probation as set forth in the special

11   conditions.  I do not impose a fine largely because it would

12   interfere with the defendant's requirement of restitution, and I

13   do require that he pay the $100 mandatory special assessment.

14     Counsel, that is my judgment and sentence.  Do you have any

15   questions about it?

16          MR. RUSSELL:  No, Your Honor.

17          MR. CREAGER:  Nothing further, Judge.  Thank you.

18          THE COURT:  Do you want any further elaboration of my

19   statement of reasons?

20          MR. RUSSELL:  No, Your Honor.

21          MR. CREAGER:  No, Judge.

22          THE COURT:  Alright.  Dr. Benz, it's my obligation to

23   tell you of your right to appeal.  Appeal means to have a higher

24   Court review what I've done.  That higher Court is in St. Louis.

25   It's called the U.S. Court of Appeals for the Eighth Circuit.  If

1    you file a notice of appeal within 14 days of today's date, that

2    higher Court will review my handling of this case, but it's got

3    to be filed, the so-called notice of appeal, within 14 days of

4    today's date.  It's not hard to do.  You can write on a piece of

5    paper, "I want to appeal," and file it in the court file.  Your

6    superb lawyer, Mr. Creager, will do that for you if you instruct

7    him to.  He must.  And the lady who sits in front of me here, the

8    court clerk, will do it for you if you tell her to.  The

9    important point is, it's got to be done within 14 days of today's

10   date or you lose your right to appeal.  In a moment, we will

11   adjourn these proceedings and then the court clerk will give you

12   a piece of paper that summarizes your appeal rights.  It is at

13   that time that you may speak with her and tell her to file a

14   notice of appeal and, if you do, she will.

15        Do you have any questions about your right to appeal, sir?

16            THE DEFENDANT:  No, Your Honor.  Thank you.

17            THE COURT:  This is me personally.  In my view, this

18   case is -- and I'm not being critical of the Government -- this

19   case is an utter tragedy.  And I think maybe Mr. Creager's right;

20   there are some times when the law is an ass and this might be one

21   of them.  We stand in recess.

22            (Recessed at 1:28 p.m.)

23                     - - -

24

25

1                    C E R T I F I C A T E

2              I, Lori J. Sehnert, court-approved transcriber, certify

3        that the foregoing is an accurate transcript from the official

4        digital sound recording provided to me of the proceedings made in

5        the above-entitled matter.

6            s/Lori J. Sehnert            DATE:  October 17, 2016

7        Signature of Approved Transcriber

8                                    - - -

9                                   INDEX

10       GOVERNMENT EXHIBITS:                    Offered   Received

11       1.   Restitution Request from            12        12

12            Victim Jessica

13            (Restricted Document)

14       2.   Sentencing Summary                  37        37

15            (Restricted Document)

16

17

18

19

20

21

22

23

24

25